Wayne A. Mack *(Pro Hac Vice Pending)*
C. Mitchell Goldman *(Pro Hac Vice Pending)*
DUANE MORRIS LLP
30 South 17th Street
Philadelphia, PA  19103-4196
Telephone:  (215) 979-1152
Facsimile:   (215) 689-3595
E-mail:  wamack@duanemorris.com
E-mail:  cmcgoldman@duanemorris.com

Cyndie M. Chang (SBN 227542)
Audra L. Thompson (SBN 218479)
DUANE MORRIS LLP
865 S. Figueroa St., Suite 3100
Los Angeles, CA 90017-5450
Telephone: (213) 689-7400
Facsimile: (213) 689-7401
E-mail:  cmchang@duanemorris.com
E-mail:  athompson@duanemorris.com
Attorneys for Plaintiff Signature MD, Inc.

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SIGNATURE MD, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>MDVIP, INC.,<br><br>Defendants. | Case No.:  2:14-cv-5453<br><br>**COMPLAINT FOR:**<br>**(1)  VIOLATION OF SHERMAN ACT (15 U.S.C. §2);**<br>**(2)  VIOLATION OF SHERMAN ACT (15 U.S.C. §1);**<br>**(3)  VIOLATION OF THE CARTWRIGHT ACT;**<br>**(4)  VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE §16600;**<br>**(5)  VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE §17200**<br><br>**DEMAND FOR JURY TRIAL** |

1

Plaintiff Signature MD, Inc. ("SignatureMD"), by and through its attorneys, Duane Morris LLP, brings this action for damages and permanent injunctive relief against Defendant MDVIP, Inc. ("MDVIP"), and alleges in support thereof as follows:

## INTRODUCTION

1.      This is an action for damages and permanent injunctive relief against MDVIP for violations of Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. § § 1 and 2, and California antitrust and unfair competition statutes.

2.      MDVIP operates the largest concierge medicine membership program in the United States.  MDVIP claims that it has more than 700 physicians in its program serving over 200,000 members in 43 states and the District of Columbia.

3.      Concierge medicine is a form of medical practice under which physicians offer their patients greater availability, longer appointments and more personalized medical care, including annual physicals or wellness exams, in exchange for the payment of a monthly or annual fee.

4.      MDVIP promotes and provides a turn-key concierge medicine membership program to physicians who desire to transition their existing practices to concierge medical practices.  MDVIP licenses physicians to use MDVIP's name, policies and procedures.  MDVIP also agrees to provide services such as patient recruitment, staff training and information technology to assist the physician in establishing, implementing and operating a concierge medicine practice.

5.      MDVIP markets its concierge medicine membership programs to patients who pay a fee of $1,500 - $1,800 to join the program and to receive enhanced services from MDVIP affiliated concierge physicians.  MDVIP retains a portion of the annual fee paid by the patients.

6.      MDVIP requires that physicians who participate in its program agree to limit their practices to no more than 600 MDVIP members and to give up all their other patients.

7. MDVIP has monopoly power in a number of markets connected with concierge medicine, including the market for turn-key concierge medicine membership programs (the "Concierge Medicine Membership Program Market").

8. MDVIP has a market share of over 70% in the Concierge Medicine Membership Program Market in the U.S. and a market share of 65% -100% in many major cities and local markets in the U.S.

9. Plaintiff SignatureMD competes with Defendant MDVIP by offering its own turn-key program for physicians that includes management services and assistance in opening and operating concierge medicine practices. Patients who join the SignatureMD concierge medicine membership program receive concierge medical care from affiliated physicians.

10. Unlike MDVIP, SignatureMD does not require its physicians to drop existing patients when they join its program.

11. As detailed herein, rather than compete for market share on the merits, Defendant MDVIP has abused its dominance in the relevant markets by utilizing anti-competitive tactics and entering into anti-competitive agreements intended to unlawfully maintain and expand MDVIP's monopolies and to preclude SignatureMD and others from competing against it.

12. Defendant MDVIP has systematically tied up markets for concierge medicine membership programs by entering into lengthy and unduly restrictive exclusive dealing agreements with physicians that prohibit them from speaking with or contracting with SignatureMD or any other company offering concierge medicine membership programs during the term of their agreement with MDVIP *and for a period of two years after their agreement with MDVIP expires*.

13. MDVIP's agreements with its affiliated physicians are in effect evergreen agreements that lock physicians into renewing their arrangement with MDVIP throughout the remainder of their professional careers, rather than switching to a competing program, such as that offered by SignatureMD.

14.     MDVIP's anti-competitive conduct has injured competition by denying physicians the ability switch to alternative concierge medicine membership programs and by denying patients the right to choose to enroll in alternative programs while maintaining a relationship with their existing physicians.

15.     MDVIP's anti-competitive agreements have effectively barred SignatureMD and other competitors from access to many local markets.

16.     Plaintiff SignatureMD has been foreclosed from competing with MDVIP and severely injured by Defendant MDVIP's illegal anti-competitive conduct.

**PARTIES**

17.     Plaintiff SignatureMD is a California corporation with its principal place of business at 4640 Admiralty Way, Suite 410, Marina Del Rey, CA 90292.

18.     Defendant MDVIP is a Delaware corporation with its principal place of business at 6001 Broken Sound Parkway NW, Suite 100, Boca Raton, FL.

**JURISDICTION AND VENUE**

19.     This action arises, in part, under Section 16 of the Clayton Act, 15 U.S.C. § 26, to prevent and restrain violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and under Section 4 of the Clayton Act, 15 U.S.C. § 15, to compensate Plaintiff for its damages.  This Court has jurisdiction over the federal antitrust law claims alleged herein pursuant to 15 U.S.C. § 15 and 28 U.S.C. §§ 1331, 1337.

20.     This court has supplemental jurisdiction over Plaintiff's claims under state laws pursuant to 28 U.S.C. § 1367 because the facts alleged herein support antitrust claims under both federal and state law.

21.     In addition, this court has jurisdiction pursuant to 28 U.S.C. § 1332 because the suit is between "citizens of different States" and the amount in controversy exceeds $75,000.

22.     This Court has personal jurisdiction over Defendant MDVIP pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and because Defendant MDVIP regularly does and solicits substantial business in California, is consistently and

substantially present in California and has established minimum contacts in California.

23.   Venue is proper in this judicial district pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22 and 28 U.S.C. § 1391 (b)-(d) because a substantial part of the events giving rise to Plaintiff's claims occurred in this District, a substantial part of effected interstate trade and commerce affected by the anti-competitive conduct occurred in this District and the Defendant resides in and is doing business within this District.

## FACTUAL BACKGROUND
### Concierge Medicine

24.   Concierge medicine is a type of enhanced and personalized medical care that is offered by only a limited number of physicians in the United States ("Concierge Physicians").

25.    Concierge medicine is practiced by physicians who specialize in internal medicine ("Internists") or family medicine ("Family Practitioners" or  "Family Physicians").  The majority of Concierge Physicians are Internists.

26.   Concierge Physicians charge a monthly, quarterly or annual fee for providing services that are not covered by Medicare or private insurance and that are beyond the customary care that a traditional Internist or Family Practitioner provides.

27.   The enhanced and personalized concierge medical services offered by Concierge Physicians typically include same day appointments, availability via telephone, email or text at any time day or night, little or no waiting time in the office and preventive and wellness services, including an in-depth annual executive physical.

28.   To accommodate this increased availability and longer visits, Concierge Physicians typically see fewer patients than physicians in conventional practice, ranging from 200 to 600 patients per doctor, compared to 2,000 or more patients that the average Internist or Family Practitioner sees every year.  The average wait time

nationally for a patient to see a physician is 20 days.  Members of concierge medicine membership programs see their doctor the same day or the next business day.

29.     To be able to successfully practice concierge medicine, an Internist or Family Practitioner must be independent and unaffiliated with a hospital or large practice group so he or she is free to transition his or her practice to concierge medical care and situated in a geographic market where there are a sufficient number of patients interested in receiving concierge care and able to pay for concierge care so as to make a concierge medical practice financially viable.  In addition, the Internist or Family Practitioner must have a significant population of patients who are over 55 years of age with a long term clinical relationship with the doctor of five years or more and who have demonstrated a high level of affinity for their physician.

30.     As a result, there are a limited number of Internists or Family Practitioners who practice or who are in a position to practice concierge medicine.

31.     Defendant MDVIP's CEO, Dan Hecht, has publicly stated that nine out of ten doctors it screens are not eligible to join its concierge medicine membership program.

32.     According to a study prepared by the independent research organization NORC at the University of Chicago ("NORC") for the Medicare Payment Advisory Commission, as of 2010, there were only 756 physicians who identified themselves as practicing concierge medicine.

33.     Physicians who practice concierge medicine are predominantly located in urban affluent areas on the east and west coasts, such as Los Angeles, Miami, Las Vegas, Atlanta and New York City.



Exhibit 1. Distribution of Identified Retainer-Based Physicians, By Metropolitan Area

Source: Analysis of information for 756 retainer-based physicians identified by NORC in October 2009.

**The Turn-Key Concierge Medicine Membership Program Market**

34.     Internists and Family Physicians who are entering the field of concierge medicine must transition their existing traditional medical practices to  practices focused on patients who are willing to pay for the increased and enhanced concierge medical services.  This involves contacting existing patients, identifying those who are interested in paying for and receiving enhanced concierge medical care and converting those patients to the doctor's new concierge medicine practice.

35.     There are several companies that offer turn-key concierge medicine membership programs to physicians who are interested in transitioning their practice to concierge medicine.  These turn-key programs are often referred to in the industry as "franchises" because they involve an established network of  Concierge Physicians who have signed a contract that licenses the use of a common trade name and because

the physicians who join the program receive ongoing support and assistance in exchange for a fee.

36.   Turn-key concierge medicine membership program providers have developed a screening process that they use to analyze the suitability of a practice for conversion to concierge medicine.

37.   A turn-key concierge medical membership program offers a number of unique benefits to a physician interested in practicing concierge medicine.  By joining an established program, the physician becomes part of a network with brand-name recognition and the benefit of a web presence, advertising and promotional support. In addition, the physician receives hundreds of thousands of dollars' worth of services from the program provider in transitioning his or her practice, including the development of a conversion plan, months of on-site staffing, outbound telephonic, mail and email education campaigns to patients, marketing services, public relations support and management, administrative and regulatory support in building and operating a concierge medical practice.

38.   The Concierge Medicine Membership Program Market is a separate and distinct market with peculiar characteristics, distinct prices, sensitivity to price changes and specialized vendors.  Although a physician could retain a consultant to provide advice regarding transitioning his or her practice or attempt to convert his practice on his or her own, there is no price elasticity of demand between these services and they are not reasonably interchangeable substitutes for joining a concierge medicine membership program.  Given the initial screening process, branding, marketing, pricing and services provided by concierge medicine membership program providers, both patients and physicians consider concierge medicine membership programs as an independent market.

39.   Barriers to entry are high and challenging for potential entrants into the Concierge Medicine Membership Program Market.  Physicians are very risk averse and are reluctant to join a start-up or small concierge medicine membership program.

To enter the market, a concierge medicine membership program provider must spend hundreds of thousands of dollars developing a screening process that will identify those physicians and practices which can successfully be converted to concierge medicine.  Once those physicians are identified and join the program, the membership program provider must then invest hundreds of thousands of dollars in conversion costs in transitioning each practice from a traditional practice to concierge medicine.

### Defendant MDVIP

40.     Defendant MDVIP was formed in 2000 and is one of the first companies that offered a turn-key concierge medicine membership program to physicians interested in transitioning their practices to concierge medicine and a concierge medicine network to patients interested in receiving enhanced and personalized medical services.

41.     MDVIP maintains a website, www.mdvip.com, on which it promotes its concierge medicine membership program to both physicians and consumers.

42.     According to the website, "MDVIP is a personalized healthcare program that empowers people to reach their health and wellness goals through in-depth knowledge, expertise and one-on-one coaching with some of the finest primary care doctors in America."

43.     MDVIP claims that the "cornerstone of our program" is its MDVIP-affiliated doctors.   MDVIP represents that it searches the country for doctors to join its team and conducts a rigorous screening process to select only those doctors who will stand behind its mission to provide the highest level of personalized care possible.

44.     MDVIP requires its physicians to agree to limit his or her practice to no more than 600 members.

45.     MDVIP has been very successful in signing up physicians and patients to participate in its program.  In 2006, MDVIP reported that it had 130 doctors within its network and 40,000 patient members.  Eight years later, MDVIP had grown

significantly and claims it has over 700 doctors and more than 215,000 members participating in its concierge medicine membership program.[1]

46.   MDVIP collects $1,500 - $1,800 in fees from each patient who joins its program and MDVIP retains $500 - $550 as its share of the fee from each member. Therefore, MDVIP generates approximately $350 million in annual fee revenue and MDVIP retains more than $100 million annually as its share of those fees through the operation of its program.

### Concierge Choice Physicians

47.   Concierge Choice Physicians ("Concierge Choice') also competes in the Concierge Medicine Membership Program Market by offering a turn-key program to Internists and Family Physicians wishing to transition their traditional practice to concierge medicine.

48.   Concierge Choice was formed in 2005 and claims it is the second largest concierge medicine company overall.

49.   Concierge Choice has contracts with 192 physicians and an estimated 18,900 members enrolled in its program.

50.   Concierge Choice works with medical practices in 23 states.

### Plaintiff SignatureMD

51.   Plaintiff Signature MD was formed in 2007 and also offers a turn-key concierge medicine membership program to physicians.

52.   SignatureMD's concierge medicine membership program is superior to that of the competition for a number of reasons, including the following:

    a.   SignatureMD does not require the termination of any non-member patients or the loss of associated revenue;

    b.   SignatureMD's program is fully customized for each physician.

---

[1]   Although MDVIP claims that it has over 700 MDVIP-affiliated doctors in its press releases, it identifies and provides profiles for 636 physicians who participate in its program on its website.

c.  SignatureMD's affiliated physicians contract directly with their patients while MDVIP contracts directly with patients and pays its affiliate physicians a fee.

d.  SignatureMD's contracts with physicians have a shorter term than do MDVIP's contracts.

e.  SignatureMD typically contracts with its physicians to renew at a reduced rate to that of its competitors.

f.  SignatureMD provides physicians the option to terminate their participation agreement at any anniversary.

g.  Because the vast majority of  SignatureMD affiliated physicians do not terminate their non-member patients, they can always re-constitute their practice(s) should there be a change in regulations or should they desire to return to a traditional practice.

53.  Concierge medical practices that participate in SignatureMD's program grow at an annualized average rate of 3%, net of attrition, while practices affiliated with its competitors shrink at a rate of 5% - 8% annually.

54.  SignatureMD has contracts with 64 doctors and has 13,500 members enrolled in its program.

/ / /

/ / /

/ / /

COMPLAINT

**<u>MDVIP's Dominant National Market Share</u>**

55.     MDVIP dominates and controls the Concierge Medicine Membership
Program Market in the U.S. with 71% of the physicians enrolled in turn-key
programs.

56.     Concierge Choice has contracts with 22% of the physicians in the
concierge medicine membership market.

57.     SignatureMD has contracts with 7% of the physicians who have joined a
concierge medicine membership program.



///
///
///

58.     Nationally, MDVIP  has contracts with 86% of the patients enrolled in a concierge medicine membership program.

59.     Concierge Choice has contracts with an estimated 8% of the patients in the Concierge Medicine Membership Program Market in the U.S..

60.     SignatureMD has contracts with 6% of the patients in the market.



**MDVIP's Dominance of Local Markets**

61.     MDVIP also dominates the Concierge Medicine Membership Program market in many local geographic markets and submarkets.

62.     Consumers of concierge medicine services care about the distance they need to travel for those services.

63.     One of the primary benefits to patients from enrolling in a concierge medicine membership program is increased availability to their physicians.  Concierge medicine patients do not and will not travel long distances for such care.

64.     Studies have shown that patients will not travel more than 30 minutes for routine health care provided by a primary care physician.  Depending on the market,

this is an average distance of 15 to 25 miles. [2]

65.    Thus, the relevant geographic markets for turn-key concierge medicine membership programs are local markets where the physicians who practice concierge medicine maintain their offices and where patients are and would be willing to travel to receive concierge medical care.

MDVIP has a market share of between 65% -100%  of the physicians participating in turn-key concierge medicine membership programs who are located within a 25 mile radius of many major cities.

| MARKET | NUMBER OF CONCIERGE MEDICINE MEMBERSHIP PROGRAM PHYSICIANS | NUMBER OF CONCIERGE MEDICINE MEMBERSHIP PROGRAM PHYSICIANS UNDER CONTRACT WITH MDVIP | MDVIP MARKET SHARE |
|---|---|---|---|
| Atlanta, GA | 19 | 18 | 95% |
| Arlington, VA | 47 | 31 | 66% |
| Baltimore, MD | 34 | 23 | 68% |
| Birmingham, AL | 6 | 6 | 100% |
| Boca Raton, FL | 32 | 28 | 88% |
| Boston, MA | 15 | 15 | 100% |
| Camden, NJ | 17 | 15 | 88% |
| Cincinnati, OH | 12 | 11 | 92% |
| Houston, TX | 33 | 26 | 79% |
| Las Vegas, NV | 10 | 9 | 90% |
| Louisville, KY | 6 | 6 | 100% |
| Nashville, TN | 6 | 6 | 100% |
| Philadelphia, PA | 18 | 16 | 89% |
| Phoenix, AZ | 19 | 17 | 89% |
| San Antonio. TX | 6 | 6 | 100% |
| Savannah, GA | 8 | 8 | 100% |

---

[2]    The U.S. Department of Health and Human Services has established a travel time of 30 minutes and a travel distance of 15 miles in mountainous terrains, 20 miles under normal conditions and 25 miles in areas connected by interstate highways as the "rational area" for measuring whether a particular area has a shortage of primary care physicians.

66.     MDVIP has most if, not all, of the Internists and Family Physicians who would be interested in and eligible to join a turn-key concierge medicine membership program under contract in each of these markets.  There are very few, if any, other Internists and Family Physicians who would be interested in and eligible to join the program of a competitor in any of these markets.

### MDVIP's Anti-Competitive Agreements

67.     In order to successfully compete with MDVIP in any local market, other turn-key concierge medicine membership program providers, such as SignatureMD, must sign up Internists and Family Physicians to join their program in that local geographic area.  After they sign up a physician to join their program, concierge medicine membership program providers then are able to convert approximately 20% of the physician's current patient panel to the concierge medicine membership program.  If the turn-key concierge medicine membership program provider is not able to contract with local physicians to join its network, it is simply impossible for that program to enter or compete with MDVIP in that market.

68.     MDVIP has systematically locked competitors out of the Concierge Medicine Membership Program Market by entering into unduly restrictive and unreasonably lengthy exclusive dealing agreements with physicians that prohibit them from speaking with or joining a competitor's concierge medicine membership program *after* their contract with MDVIP ends.

69.     The terms of these agreements cannot be justified by any procompetitive purpose.

70.     The non-competition provisions in the MDVIP Services Agreements apply are unreasonable in scope and duration.

71.     MDVIP's standard form contract with its affiliated physicians is called a "Services Agreement."

72.     MDVIP has drafted its Services Agreement to protect its market share and to prevent competitors from signing up doctors and patients.

73.     Under the MDVIP Services Agreement, physicians agree to limit their practice to no more than 600 MDVIP members.  This means that they must drop any existing patients who do not enroll in its program.  This limits competition among MDVIP physicians in a market and is a form of horizontal customer allocation.

74.     The MDVIP Services Agreement with a participating doctor typically has a five year term with an automatic renewal for an additional five year period.  MDVIP maintains a unilateral right to terminate and not renew the agreement after five years.

75.     MDVIP began including a post-termination covenant against competition in its contracts with physicians in 2009 which was shortly after SignatureMD and Concierge Choice were formed.

76.     From 2009 until in or about 2012, MDVIP's Services Agreement with affiliated physicians contained a post-termination non-compete that applied for a period of one year after the expiration of the contract.

77.     In or about 2012, MDVIP increased the term of the post-termination non-compete to two years for no reason other than to erect an additional barrier to competition and to further impede competition.

78.     The overwhelming majority of physicians in MDVIP's program have signed contracts since 2009 and are subject to a post-termination non-compete.

79.     The provisions against competition in MDVIP's Services Agreement prohibit the physician from practicing concierge medicine independently or with another concierge medicine membership program within a ten mile radius of his or her existing office or within a ten mile radius of an office of any MDVIP affiliated physician.  The term "compete" is defined as including the rendering of services substantially similar to those offered by MDVIP to its members and creating, establishing or participating in any program substantially similar to MDVIP.

80.     The non-competition provision in the standard MDVIP Services Agreement is applicable during the term of the Services Agreement, during any

renewal of the Services Agreement and for two years after the Agreement is terminated for any reason.

81.    The MDVIP Services Agreement restricts the ability of physicians to contract with SignatureMD or another competitor upon the expiration of their contract with MDVIP.

82.    In certain parts of the U.S., including California, MDVIP includes a liquidated damages clause in its Services Agreement that requires the physician to pay $1 million to MDVIP if he or she leaves the program and signs up with a competing program provider.  This clause has the same effect as the non-competition covenant and is a blatant attempt to limit competition.

83.    Because of the provisions that prohibit physicians from contracting with another program or competing against MDVIP after the expiration of contract, a physician whose contract with MDVIP is scheduled to expire has no real choice but to renew with MDVIP  or else he or she will have to leave the practice of concierge medicine altogether.

84.    MDVIP's contracts with physicians have the effect of binding a concierge physician to MDVIP for the duration of that physician's career in private practice.  A physician in a traditional fee for service (non-concierge practice) typically cares for 1,500 to 3,000 patients, each of whom generate approximately $250 in annual revenue; resulting in $375,000 - $750,000 in annual revenue.  A concierge physician with 300 patients generates approximately $350,000 in membership fee revenue and $75,000 in fee for service revenue, resulting in gross annual revenue of $425,000.  A concierge physician with 600 patients would have gross annual revenue of approximately $850,000.  If bound by a covenant not to compete for two years, a former concierge physician would be left with a practice of 300 to 600 patients generating fee for service revenue of $75,000 - $150,000 annually ($250 per patient per year).  At $150,000 per year, a physician would not be able to cover overhead, let

1    alone make a living.  Such a physician would no longer be able to remain in private

2    practice.

3                    **The Anti-Competitive Effects of MDVIP's Exclusive Contracts**

4         85.    The non-competition provisions in MDVIP's contracts with affiliated

5    Concierge Physicians are intended to harm and have harmed competition by

6    foreclosing SignatureMD and other competitors from gaining a foothold in the

7    applicable markets.

8         86.    The non-competition provisions in MDVIP's Services Agreements with

9    affiliated physicians give MDVIP the ability to exclude competition in relevant

10   markets.

11        87.    The non-competition provisions in the MDVIP Services Agreements

12   restrict patient choice because patients are not able to switch to a new competing

13   concierge medicine membership program without sacrificing their relationship with

14   their physician who is locked into his or her contract with MDVIP.

15        88.    According to MDVIP, 92% or more of the patients in its program renew

16   every year.

17        89.    The Boca Raton market demonstrate the anti-competitive consequences

18   of MDVIP's contracts.  There are 32 physicians who have joined turn-key concierge

19   medicine membership programs practicing within a 25 mile radius of Boca Raton,

20   Florida.  MDVIP has exclusive long term contracts with 28 of these physicians (88%).

21   These contracts have firmly entrenched MDVIP as the dominant concierge medicine

22   membership program.  MDVIP has almost 10,000 members and 98% of the patients

23   enrolled in a concierge medicine membership program within a 25 mile radius of

24   Boca Raton.

25        90.    SignatureMD's has aggressively attempted to compete with MDVIP in

26   the Boca Raton market and invested thousands of dollars of resources over a period of

27   many years to establish itself in those markets.

28

91.     Notwithstanding its best efforts, because 88% of the physicians in the Concierge Medicine Membership Program Market in Boca Raton are contractually bound to MDVIP for lengthy terms and the vast majority are precluded from contracting with SignatureMD *even upon the expiration of their contracts and for a period of time thereafter*, SignatureMD has not been able to penetrate or successfully compete in this market.  To date, only two doctors and 200 patients have joined the SignatureMD concierge medicine membership program in the Boca Raton market.

92.     A similar situation exists in the other local markets where MDVIP has long term, exclusive contracts with 65% - 100% of the physicians participating in concierge medicine membership programs, including Atlanta, GA, Arlington, VA, Baltimore, MD, Birmingham, AL, Boston, MA, Camden, NJ, Cincinnati, OH, Fort Lauderdale, FL, Houston, TX, Las Vegas, NV, Louisville, KY, Nashville, TN, Philadelphia, PA, Phoenix, AZ, San Antonio, TX and Savannah, GA .

### MDVIP's Other Anticompetitive Conduct

93.     MDVIP has engaged in other anticompetitive conduct designed to preclude competition.

94.     MDVIP regularly threatens doctors and competitors with legal action if they even speak concerning the possibility of entering into a potential business relationship following the expiration of the physician's contract with MDVIP.

95.     MDVIP requires that all physicians who are considering joining its program must sign non-disclosure agreements that prohibit the physicians from sharing the results of patient satisfaction surveys with any other competing concierge medicine membership programs that they may be considering joining.  Such surveys are a preliminary step in determining whether a physician's practice can be converted to concierge medicine and contain basic information about the patient's relationship with their physician and their general interest in joining a concierge medicine membership program.  The survey results do not contain confidential information regarding MDVIP.  By precluding physicians who are considering joining a concierge

medicine program from sharing basic patient satisfaction information with competitors, MDVIP makes it difficult for these competitors to compete in the marketplace.  Competitors must base their analysis of patient satisfaction on less reliable data, such as online physician ratings.  There is no legitimate reason why the physician should be precluded from sharing the results of a patient satisfaction survey with a competitor of MDVIP.

96.    One of the key benefits to a physician from joining a concierge medicine membership program is that the program provider places a patient conversion specialist, sometimes called a patient advocate, in the affiliated physician's office for a period of three to four months to manage the conversion process, and in particular speak to patients about the benefits of membership.  The patient advocate must be willing and able to travel and reside for three to four months in the location of the physician.  The patient advocate role does not involve the use of a program provider's proprietary information, but rather relies on personality and an understanding of the concierge medicine industry.

97.    Both MDVIP and SignatureMD use patient advocates in their respective conversion process.  MDVIP frequently hires patient advocates on a temporary basis for one or a few engagements and then terminates their employment.  Despite the short term temporary nature of this employment, MDVIP insists as a condition of employment that its patient advocates sign an employment agreement with two year post termination non-compete restriction of national scope thus precluding their employment with a competitor.  MDVIP has no legitimate business justification for the restrictive covenant and uses it simply to hinder its competitors from hiring individuals who are experienced in the concierge medicine industry.  Following the expiration of the restrictive covenant, MDVIP continues this anti-competitive conduct by filing lawsuits against its former patient advocates who work for competitors.

98.     As MDVIP is by far the largest company in the concierge medicine membership program market with hundreds of current and former employees, the vast majority of experienced workers have worked at MDVIP at one time or another.

99.     MDVIP attempts to maintain its dominance in the market by forcing all employees, including short term entry level people and temporary and remote employees, to sign unreasonable and unenforceable contractual restraints on their ability to work for a competitor and then uses threatened and actual lawsuits against former employees after the expiration of the restrictive covenants to continue to foreclose competitors from hiring experienced workers.

100.    MDVIP has filed  a series of baseless lawsuits against its competitors, including SignatureMD, Concierge Choice, and Medley Health to try and keep or force them out of the market.  These lawsuits were not filed for any valid purpose, but were objectively and subjectively baseless sham suits intended to squelch competition. No reasonable litigant could reasonably expect success on the merits of these lawsuits and they were an attempt to interfere directly with the business relationship of a competitor through the misuse of legal process.

101.    MDVIP specifically implemented an anti-competitive sham litigation strategy against SignatureMD after SignatureMD entered the market.  The goal of this litigation was not to win the litigation, but to use the litigation process as an anti-competitive weapon to prevent SignatureMD from competing and to attempt to drive SignatureMD from the market.

102.    MDVIP implemented its strategy by sending demand letters to SignatureMD threatening litigation whenever SignatureMD hired a former MDVIP employee despite the fact that the restrictive covenants governing the employee had long expired or were no longer legally enforceable.  At the same time, MDVIP created an atmosphere of intimidation among former MDVIP employees by threatening to seek injunctive relief against them through court action should they become employed by SignatureMD after the expiration of their restrictive covenants, or if they speak to

any current or other former employee who calls them about employment at SignatureMD.

103.   In January, 2013, MDVIP filed a meritless sham lawsuit against SignatureMD and some of its employees asserting "theft of trade secret" and "tortious interference" claims in order to interfere with SignatureMD's business and employment relationships, and in an attempt to force SignatureMD out of the market by expending much needed growth capital on expensive litigation.

104.   MDVIP's intent in filing the lawsuit was not to enjoin SignatureMD from using any trade secret.  In fact, MDVIP withdrew its motion for a preliminary injunction when SignatureMD set it for hearing and has refused to identify a single trade secret it has or that is being used by any former employee.  Instead, MDVIP intended to use the litigation to cause competitive harm to SignatureMD by harassing SignatureMD's employees and affiliated physicians.

105.   MDVIP used the discovery process to interfere with SignatureMD's business relationships and to harass physicians who contracted with SignatureMD. MDVIP served extensive and intrusive discovery demands upon physicians who affiliated with SignatureMD forcing them to sit for day-long depositions away from their practices in which MDVIP's attorneys ask questions that have nothing to do with the claims in the litigation.

106.   MDVIP also misused the discovery process in order to gain competitive intelligence about Signature MD, including information about:

    a.   The structure of SignatureMD's business model

    b.   All services SignatureMD provides to its affiliated physicians

    c.   The amount SignatureMD charges its physicians for its services

    d.   How SignatureMD chooses to target physicians

    e.   The identity of physicians with whom SignatureMD is in negotiations

    f.   The type of data SignatureMD looks at for each physician it is considering

    g.   The statistical models developed by SignatureMD to evaluate physicians

h.  The marketing events SignatureMD holds to recruit physicians

i.  SignatureMD's contract negotiation practices

j.  The terms contained in physician contracts

k.  Whether SignatureMD includes restrictive covenants in its physician contracts

l.  The total number of SignatureMD affiliated physicians

m.  SignatureMD's communications with its affiliated physicians

n.  How SignatureMD transitions a traditional practice to a concierge practice

o.  The growth of each SignatureMD affiliated physician's practice once converted

p.  How many patients each SignatureMD successfully converted for each physician

q.  The total number of patients who have joined SignatureMD's program

r.  The annual membership fee paid by patients

s.  SignatureMD's billing practices for its affiliated physicians

t.  Whether SignatureMD affiliated physicians conduct annual physicals on patients

u.  The lab charges under SignatureMD's program

v.  How SignatureMD communicates with patients after they become a SignatureMD member

w.  SignatureMD's market strategies and materials

x.  SignatureMD's plan to compete with competitors

y.  SignatureMD's job descriptions for its current employees

z.  SignatureMD's total number of sales representative and where they are located

aa.  The compensation paid to every SignatureMD employee

bb.  SignatureMD's total revenues

cc.  SignatureMD's acquisition cost for its physician affiliates

    dd.   The conversion rate of physicians

    ee.   The renewal rate of SignatureMD's patient members

    ff.   The attrition rate for SignatureMD's patient members

    gg.   Referral fees paid to physicians who refer other physicians to
          SignatureMD

    107.   MDVIP has no realistic expectation of success on its trade secret or tortious interference claims and filed the case to harm SignatureMD and to destroy competition in order to maintain its monopoly.

## COUNT I

## VIOLATION OF SECTION 2 OF THE SHERMAN ACT (15 U.S.C. §2)

    108.   Plaintiff incorporates by reference the preceding allegations as if fully set forth herein.

    109.   The relevant product markets in which Defendant MDVIP has acted anti-competitively include the Concierge Medicine Membership Program Market and other markets and submarkets related to concierge medicine.

    110.   The relevant geographic markets in which Defendant MDVIP has acted anti-competitively are the local markets in which its MDVIP affiliated physicians practice concierge medicine, such as, Atlanta, GA, Arlington, VA, Baltimore, MD, Birmingham, AL, Boston, MA, Camden, NJ, Cincinnati, OH, Fort Lauderdale, FL, Houston, TX, Las Vegas, NV, Louisville, KY, Nashville, TN, Philadelphia, PA, Phoenix, AZ, San Antonio, TX and Savannah, GA.  The United States or regions thereof are alternative geographic markets.

    111.   Defendant MDVIP has monopoly power in these product and geographic markets, including the power to control prices and exclude competition.

    112.   Alternatively, Defendant MDVIP has attempted to monopolize these markets and there is a dangerous probability that MDVIP will achieve monopoly power in these markets.

113.   Defendant MDVIP's activities substantially affected interstate commerce in the United States and caused antitrust injury throughout the United States.

114.   As alleged herein, Defendant MDVIP has willfully and intentionally engaged in anti-competitive conduct in order to unlawfully acquire and maintain its monopoly in these markets in violation of Section 2 of the Sherman Act.

115.   Defendant MDVIP has effectively restrained, and further threatens to restrain, competition in these markets by prohibiting physicians from contracting with SignatureMD and other competitive concierge medicine membership programs upon the expiration of their contracts with MDVIP and by prohibiting physicians from converting patients to SignatureMD's concierge medicine membership program.

116.   Defendant MDVIP has effectively restrained, and further threatens to restrain, competition in these markets by engaging in the other anti-competitive conduct alleged herein designed to prevent and to make it difficult for SignatureMD to hire new employees or to contract with Concierge Physicians and to otherwise impede SignatureMD from competing.

117.   As a direct, foreseeable and proximate result of MDVIP's anti-competitive and monopolistic conduct, SignatureMD has been injured in its business.

118.   As a direct, foreseeable and proximate result of MDVIP's anti-competitive and monopolistic conduct, competition, consumers and patients in the relevant markets have been harmed, by among other things, increased prices, the reduced output and availability of alternative providers of the relevant products and loss of and interference with their  relationship with their physician.

119.   Because of MDVIP's actions, SignatureMD is, at least, entitled to:  i) compensatory damages in an amount according to proof; ii) treble damages pursuant to 15 U.S.C. §15(a); iii) injunctive relief issued against Defendant MDVIP; and iv) reasonable attorneys' fees and costs of suit under 15 U.S.C. §15(a).

## COUNT II

## VIOLATION OF SECTION 1 OF THE SHERMAN ACT (15 U.S.C. §1)

120.   Plaintiff incorporates by reference the preceding allegations as if fully set forth herein.

121.   In violation of Section 1 of the Sherman Act, Defendant MDVIP entered into agreements in unreasonable restraint of trade, namely Services Agreements which contained exclusive dealing provisions and prohibited MDVIP affiliated physicians from contracting with SignatureMD following the expiration of their contracts with MDVIP.

122.   These agreements are unreasonably restrictive in terms of breadth, duration and market coverage.

123.   In addition, Defendant MDVIP entered into agreements with competing physicians that limit the number of patients those competitors will treat which is an illegal form of horizontal customer allocation.

124.   This web of exclusive dealing and non-compete agreements cannot be justified by any purportedly procompetitive purpose, but instead serve the anti-competitive purpose of cutting competitors off from physicians and patients and competing against MDVIP.

125.   This conduct has substantially foreclosed competition in the Concierge Medicine Membership Program Market in the relevant geographic markets.

126.   Defendant MDVIP has market power in the relevant product and geographic markets, including the power to control prices and exclude competition.

127.   As a direct, foreseeable and proximate result of MDVIP's anti-competitive conduct, SignatureMD has been injured in its business.

128.   As a direct, foreseeable and proximate result of MDVIP's conduct, competition, consumers (physicians) and patients in the relevant markets have been harmed, by among other things, increased prices, the reduced output and availability

of alternative providers of the relevant products and loss of and interference with the doctor/patient relationship.

129.   Because of MDVIP's actions, SignatureMD is, at least, entitled to:  i) compensatory damages in an amount according to proof; ii) treble damages pursuant to 15 U.S.C. §15(a); iii) injunctive relief issued against Defendant MDVIP; and iv) reasonable attorneys' fees and costs of suit under 15 U.S.C. §15(a).

## COUNT III

## VIOLATION OF THE CARTWRIGHT ACT

130.   Plaintiff  incorporates by reference the allegations contained in the preceding paragraphs.

131.   During all relevant periods, Plaintiff conducted a substantial volume of business in California as California is its place of incorporation and principal place of business.  As a result of Plaintiff's business operations and substantial contacts in California, Plaintiff is entitled to the protection of the laws of California.

132.   Defendant MDVIP entered into and engaged in an unlawful trust in restraint of the trade and commerce described above in violation of California Business and Professions Code section 16720 et seq.

133.   Defendant engaged in continuing trusts in restraint of trade and commerce in violation of the Cartwright Act.

134.   Defendant's trusts have included concerted action and undertakings among the several States with the purpose and effect of eliminating, to a substantial degree, competition with Plaintiff and other concierge medicine membership program providers.

135.   The anticompetitive effect of the restraint outweighed any beneficial effect of competition.

136.   In addition, as alleged above, Defendant MDVIP entered into agreements with competing physicians that limit the number of patients those competitors will treat which is an illegal form of horizontal customer allocation.

137.   Defendant MDVIP and these competing physicians are competitors in the same or related markets.

138.   As a direct and proximate result of Defendants' combinations and contracts to restrain trade and eliminate competition and Defendant's agreements to illegally allocate or divide customers and territories, Plaintiff has suffered injury to its property and has been deprived of the benefits of free and fair competition on the merits.

139.   Defendant's conduct was a substantial factor in causing Plaintiff's harm.

140.   Because of MDVIP's actions, Plaintiff SignatureMD has suffered loss of reasonably anticipated sales and profits, an increase in Plaintiff's expenses, and other damages to be proven at trial.

141.   Because of MDVIP's actions, SignatureMD is, at least, under California Business and Professions Code section 16750, entitled to:  i) compensatory damages in an amount according to proof; ii) treble damages; iii) injunctive relief issued against Defendant MDVIP; and iv) reasonable attorneys' fees and costs of suit.

## COUNT IV

## VIOLATION OF CAL. BUS. & PROF. CODE § 16600

142.   Plaintiff  incorporates by reference the allegations contained in the preceding paragraphs.

143.   Defendant MDVIP entered into, implemented, and enforced express agreements that are unlawful and void under Section 16600 of the California Business & Professions Code.

144.   Defendant's agreements and conspiracy have included concerted action and undertakings with the purpose and effect of reducing open competition; reducing physician mobility and eliminating opportunities for patients to pursue their choice of physicians.

145.    Defendant's agreements and conspiracy are contrary to California's settled legislative policy in favor of open competition and are therefore void and unlawful.

146.    Defendant's agreements and conspiracy were not intended to protect and were not limited to protect any legitimate proprietary interest of Defendant.

147.    Defendant's agreements and conspiracy do not fall within any statutory exception to Section 16600.

## COUNT V

## UNFAIR COMPETITION

## IN VIOLATION OF CAL. BUS. & PROF. CODE §§ 17200, ET SEQ.

148.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

149.    Defendant MVIP's actions to restrain trade constitute unfair competition and unlawful, unfair, and fraudulent business acts and practices in violation of California Business and Professional Code sections 17200, et seq.

150.    The conduct of Defendant MDVIP in engaging in combinations with others with the intent, purpose, and effect of creating and carrying out restrictions in trade and commerce; eliminating competition constitutes and was intended to constitute unfair competition and unlawful, unfair, and fraudulent business acts and practices within the meaning of California Business and Professions Code section 17200.

151.    Defendant also violated California's Unfair Competition Law by violating the Cartwright Act and/or by violating Section 16600 of the California Business and Professions Code.

152.    As a result of Defendant's violations of Business and Professions Code section 17200, Defendants have unjustly enriched themselves at the expense of Plaintiff.

153.   The unjust enrichment continues to accrue as the unlawful, unfair, and fraudulent business acts and practices continue.

154.   The acts and business practices, as alleged herein, constituted and constitute a common, continuous, and continuing course of conduct of unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices within the meaning of California Business and Professions Code section 17200, et seq., including, but in no way limited to, violations of the Sherman Act, the Cartwright Act and/or Section 16600.

155.   Defendant's acts and business practices as described above, whether or not in violation of the Sherman Act, the Cartwright Act and/or Section 16600 are otherwise unfair, unconscionable, unlawful, and fraudulent.

156.   To prevent its unjust enrichment and by reason of Defendant's business acts and practices described above, Defendant MDVIP should be required pursuant to Business and Professions Code sections 17203 and 17204 to disgorge its illegal gains including but not limited to disgorgement of all revenues, earnings, profits, compensation, and benefits for the purpose of making full restitution.

157.   Defendant MDVIP should also be permanently enjoined from continuing its violations of Business and Professions Code section 17200.

158.   Plaintiff seeks relief for both itself and for the general public, and to enforce an important right affecting the public interest, by having a preliminary and/or permanent injunction issued against Defendant.

159.   The relief sought herein, if successful, would confer a significant benefit on the general public.

160.   As a private attorney general seeking to confer an important benefit to the public at large, Plaintiff seeks to recover its reasonable attorneys' fees pursuant to California Civil Procedure Code section 1021.5.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff SignatureMD prays for relief as follows:

COMPLAINT

A.     For an order enjoining Defendant MDVIP's conduct and declaring and adjudging that such conduct is unlawful and in violation of the federal antitrust law and California antirust and unfair competition law, and that Plaintiff was injured in its business as a result of Defendant's violations;

B.     For a judgment awarding Plaintiff damages against Defendant MDVIP as a result of Defendant's unlawful conduct, including treble damages under 15 U.S.C. §15(a) and California Business and Professions Code §16750 and all other available damages whether punitive, exemplary or otherwise;

C.     For an award to Plaintiff of its costs of suit, including reasonable attorneys' and experts' fee and expenses, under all available remedies including but not limited to 15 U.S.C. §15(a), California Civil Procedure Code §1021.5, and California Business and Professions Code §16750;

D.     For an award of pre-judgment interest; and

E.     For any other and further relief that the Court may deem just and proper.

## **JURY DEMAND**

Plaintiffs hereby demand a trial by jury pursuant to Rule 38, Federal Rules of Civil Procedure.

Dated:   July 14, 2014               **DUANE MORRIS LLP**


By:     s/   Cyndie M. Chang
                Cyndie M. Chang
Attorneys for Plaintiffs
Signature MD, Inc.